# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| RONALD BERNARD,<br><br>                      Plaintiff,<br><br>v.<br><br>KANSAS CITY LIFE INSURANCE CO.,<br><br>                      Defendant. | Case No. 19-4043 |

## ORDER

Plaintiff Ronald Bernard and defendant Kansas City Life Insurance Co. each move for summary judgment on all of the counts asserted in Bernard's complaint. Docs. 17, 20. Defendant also moves in limine to exclude any evidence not contained in the administrative record. Doc. 20. For reasons set forth below, Defendant's motion in limine is granted.

The motions for summary judgment turn on whether Bernard was disabled prior to the termination of his disability insurance coverage. As discussed below, the Court finds that Kansas City Life Insurance Co. abused its discretion when it denied Bernard's request for short term and long term disability benefits because there is not substantial evidence in the record to support its conclusion that Bernard was not disabled prior to his termination from employment. Therefore, the Court grants Bernard's motion for summary judgment and denies Defendant's motion for summary judgment.

## I.     Uncontroverted Facts

The parties both assert that there is no dispute of fact and that the parties' disputes concern only the legal significance of the facts. *See* Doc. 21, p. 22; Doc. 25, p. 1.

## A. Bernard's Employment

On August 1, 1991, Bernard began working as a certified nurse anesthetist at Mid-Missouri Anesthesiologists, Inc. KCL_0000170.[1] He worked at an ortho surgical clinic five days a week, for a total of 40 hours per week, administering anesthesia. KCL_0000159. Bernard's employer describes a certified nurse anesthetist's role as follows: "Under general supervision administers local, inhalation, intravenous, and other anesthetics during surgical or other medical procedures. . . . Administer general anesthetics to render patients insensible to pain during surgical and other medical procedures; take necessary remedial action to aspirate secretions from throat[,] larynx and trachea as required." KCL_0000499. Bernard was 64 years old at the time that he ceased working. KCL_0000001.

On October 6, 2017, two nurses reported to the president of Bernard's employer that Bernard had been using syringes and that they suspected that he was using drugs. KCL_0000067. On the basis of suspected drug use, Bernard's employer immediately removed him from the operating room and took him to a drug-testing facility, where Bernard provided a sample for testing. *Id.* Before the results were provided, Bernard admitted that he had been using Fentanyl, an opiate-based narcotic, at work. *Id.*; KCL_0000157; KCL_0000502. Because of his drug use, Bernard was terminated on October 6, 2017. KCL_0000053, KCL_0000157, KCL_0000168, KCL_0000170, KCL_0000176, KCL_0000504.

The sample collected from Bernard on October 6, 2017 tested positive for Fentanyl at the level 55.49 ng/ml. KCL_0000017. (A positive test for Fentanyl is any level above .50 ng/ml. *Id.*)

---

[1] Pages from the administrative record (Docs. 16-1–16-3) are referenced using the Bates number (beginning "KCL_"). The parties stipulated that the administrative record is admissible as a business record. Doc. 14.

Bernard's employer stated that, before it became aware of his drug use, Bernard had no job performance issues and his performance was satisfactory. KCL_0000067. Bernard's employer was not aware of how long Bernard had been using drugs. *Id*. Bernard had not shown any signs of drug usage prior to October 6, 2017, the date of his termination. *Id*. Bernard also had not shown any signs of impairment. *Id*.

Notes in the administrative record indicate that, Bernard knew he could be subjected to random drug tests and that, if he tested positive, he would be terminated immediately. KCL_0000067. Still, October 6, 2017 was the first time that Bernard was subjected to a drug test, and he was tested because co-workers saw him using syringes. *Id.*

### B. Medical Opinions

Bernard's treating physician, Dr. Paul Schoephoerster, wrote on October 20, 2017, "Due to addiction unable to perform work duties as anesthetist" and "unable to function in current occupation," and that Bernard's limitations would last "indefinite[ly] regarding current occupation." KCL_0000193. The physician separately noted:

> Did review previous notes in anticipation of today's visit. Patient presents today to discuss recent falling off awaken [*sic*] as far as narcotic and alcohol addiction. Patient 1st diagnosed/sought treatment from alcohol and fentanyl a direction [*sic*] approximately 17 years ago. Did have in-patient treatment at that time, prolonged I believe about 3 months duration. Then did see counselor on a regular basis post discharge for the following 7 years or so. Patient had been clean and sober up until 2 years ago when stated drinking again which quickly lead [*sic*] to fentanyl use. Patient has been using for the last 2 years now. No alcohol, strictly fentanyl which patient would get through place of employment as nurse anesthetist."

KCL_0000060.

Bernard stated that October 18, 2017 was the earliest date he could see his treating physician. KCL_0000311. The case manager interviewing Bernard stated, "I will request OVNs from Dr. Paul from 06/11/16 to present to see if addiction is discussed and not penalize EE for the

3

delay of treatment. EE LDW 10/06/17 and first available appointment with Dr Paul was 10/18/17 so that's when forms were completed." KCL_0000311.

Addiction specialist Dr. Patricia Altenburg, who saw Bernard on October 18, 2017, noted that Bernard suffers from opioid and alcohol use, that the date of onset for the condition was 2000, that he relapsed in 2015, and that his treatment includes individual psychotherapy and AA and NA. KCL_0000165. Dr. Altenburg checked a box indicating that Bernard had "Major impairment in several areas—work, family relations. Avoidant behavior, neglects family, is unable to work." *Id.* She wrote that Bernard's limitations are "Chronic!" *Id.*

### C. History of Fentanyl Addiction

Defendant acknowledges that, in March 2017, Bernard had reported to Dr. Schoephoerster "that he had been clean from alcohol usage and IV drug use for greater than 10 years . . . ." Doc. 21, p. 15. Dr. Schoephoerster noted: "Hx [*i.e.*, history] of intravenous drug use in remission . . . . Clean now for greater than 10 years." KCL_0000117. However, during his October 18, 2017 visit to Dr. Schoephoerster, Bernard stated that he had relapsed into alcohol and then Fentanyl abuse approximately two years earlier.

### D. The Terms of the Disability Policies

Defendant issued Group Short Term Disability Income Insurance Policy Number 85850 to Mid-Missouri Anesthesiologists, Inc., effective December 1, 2016. KCL_0000515. Bernard became an insured under the short-term disability policy effective December 1, 2016. KCL_0000504.

Similarly, Defendant issued Group Long Term Disability Income Insurance Policy number 85850 to Mid-Missouri Anesthesiologists, Inc., effective December 1, 2016. KCL_0000195. Bernard was an insured under that policy as of December 1, 2016. KCL_0000502.

The policies are alike in many respects. Bernard was entitled to benefits under each policy if he became disabled while a full-time employee of his employer. KCL_0000526, KCL_0000528, KCL_0000529, KCL_0000532; KCL_0000201; KCL_0000203; KCL_0000205; KCL_0000534. A participant is disabled under each policy if he has an "illness, disease, or physical condition" that began while he was covered under the policy and that prevented him from performing all of the "Material and Substantial Duties of [His] Regular Occupation" and resulted in a loss of 20% or more of his weekly earnings. KCL_0000529; KCL_0000534.

Although the short-term disability policy does not expressly mention substance abuse, the long-term disability policy caps payment for disabilities due to, among other things, "drug abuse," at 24 months.

### E. Bernard's Applications for Disability Benefits

In connection with Bernard's applications for both short-term and long-term disability benefits, his former employer indicated that Bernard had been employed as a Certified Nurse Anesthetist or CRNA ((certified registered nurse anesthetist) for 26 years and that he was insured under the respective policies from December 1, 2016 through October 6, 2017. KCL_0000170, KCL_0000168. On the short-term disability application, the employer explained Bernard's ceasing to work as follows: "Mr. Bernard admitted to illegal drug use at the workplace. He was terminated immediately based on contract." KCL_0000170. Similarly, on the long-term disability application, the employer stated, "Employee admitted to illegal drug use at workplace after random drug test." KCL_0000168.

For the short-term disability application, in response to the question, "When (*i.e., date/time*), where and how did the injury occur?" Bernard wrote, "10/6/17 at 9[20] informed employer of my Fentanyl relapse [*sic*] use." KCL_0000265. Below that, he circled "Illness" and

5

wrote, for the date he was first treated by a physician, "Dec. 19 2001." *Id.* He further explained that he was "Off work December 19, 2001 – April 1, 2002 Treatment for Fentanyl used." *Id.* In response to a question asking if he expected to return to work, he wrote, "NOT in Anesthesia/or Nursing . . . ." *Id.*

On the long-term disability application, Bernard's statement indicated that he "[r]etired" on October 6, 2017 from 26 years of work with his former employer and 33 years total of full-time work as a certified registered nurse anesthetist. KCL_0000176. He stated that the first symptoms of the condition causing his disability were "Depression/Anxiety – Relapse alcohol/drug addition," that he first noticed depression/anxiety increasing over the prior two years, and that he had been treated for the illness before, from December 2001 through February 2002, at a "Treatment Center." KCL_0000177. To a question about the "aspect of [his] condition [that] made [him] unable to work," Bernard responded, "Relaspe [*sic*], Fentanyl addiction." *Id.*

A Claim Summary states that "EE is 64 yom Certified Nurse Anesthetist OOW due to addiction/opioid abuse." KCL_0000345.

Bernard's treating physician, Dr. Schoephoerster, completed an "Attending Physician Statement" for the short-term disability policy, dated November 2, 2017, listing Bernard's diagnosis as "Narcotic/alcohol addiction." KCL_0000262. In response to the instruction, "If physical or psychiatric limitations exist, indicate the date limitations have lasted or will last through," Dr. Schoephoerster wrote, "indefinite." *Id.* Dr. Schoephoerster described the "Nature of treatment for this condition" as "Is seeking help through NA/AA and has addiction counselor." *Id.* Dr. Schoephoerster wrote "≈ 10-1-17" as the "Date patient ceased work due to this impairment." *Id.* When questioned later by Defendant's representatives, Dr. Schoephoerster explained that his statement regarding the date on which Bernard ceased work due to impairment

6

was based on Bernard's statement that he "was terminated on or about 10-1-17 . . . ." KCL_0000034-35.

### F. Defendant's Denials of Disability Benefits

By letters dated December 13, 2017, Defendant denied Bernard's claims for short-term and long-term disability benefits. Defendant explained that it considered his termination to have been the result of Bernard's failing a drug test and admitting to illegal drug use, and not the result of a disability. Defendant also stated that, because Bernard did not seek treatment or "certif[ication]" by a physician until after his employment ended, he was not disabled under the policy while he was still eligible for benefits. KCL_0000487-88; KCL_0000095.

### G. Administrative Appeal from Denials of Disability Benefits

By letters dated May 31, 2018 and June 4, 2018, Bernard, through counsel, appealed the denial of Bernard's long-term and short-term disability benefits, respectively, referencing "Mr. Bernard's statement dated May 23, 2018, which states that he had suffered from addiction to fentanyl for many years and that he had a relapse prior to October 6, 2017" and noting that "Mr. Bernard informed his employer . . . in October 6, 2017 that he had relapsed and used Fentanyl again and that he would not be able to continue in his position . . . and requested to retire." KCL_0000079, KCL_0000053-54.

By letter dated August 31, 2018, Defendant again found that denial of the claim for long-term disability benefits was appropriate. KCL_0000030. Defendant noted that Bernard's employer indicated that he had not had "any performance issues over the last few years" and that his performance had been "satisfactory." KCL_0000031. Defendant also stated:

> The employer noted they did not have any random drug tests for your client until the day he was terminated. The employer was asked why they had done the random drug test on the day your client was terminated, and they reported that it

7

> was brought to the President's attention that your client had been using syringes and they suspected drug use. The employer reported that your client was removed from the operating room immediately and taken to a drug testing facility. They received positive results and before the results were provided, your client admitted to using drugs. As noted, your client did not seek treatment until October 18, 2017 and there is no indication he was impaired from functioning in his own occupation as of the time he tested positive for drug use and he was terminated from employment and his insurance coverage ended.

*Id*. In response to Bernard's claim that he had suffered from Fentanyl addiction for many years and relapsed prior to October 6, 2017, Defendant stated: "your client was performing his own occupation satisfactorily until he was removed from the operating room due to suspected drug use for which he tested positive" and again noted that Bernard was not treated for Fentanyl addiction until October 18, 2017, after his coverage terminated. *Id.*

In response to Bernard's counsel's October 15, 2018 letter, which enclosed a copy of the drug test results from October 6, 2017—from specimens taken while Bernard was still employed—showing that Bernard tested positive for Fentanyl (KCL_0000014), by letter dated December 12, 2018, Defendant issued its final denial of Bernard's claims for disability benefits. Defendant noted that Bernard's employer indicated that he did not have any "performance issues over the last few years" and "his performance was satisfactory . . . ." *Id.* Defendant stated, "there is nothing in the files to suggest that [Bernard] was impaired prior to October 6, 2017, and all documents indicate October 6, 2017 was his last day worked." KCL_0000005. Defendant claimed that "[t]he treatment records prior to October 6, 2017 do not indicate he was treated for addiction to Fentanyl and/or any indication [*sic*] he suffered from a loss of function." *Id.* Defendant stated, "Your client was performing his own occupation satisfactorily until he was removed from the operating room due to suspected drug use for which he tested positive on his last day he worked. He was not terminated due to work issues but rather due to his employer's serious concern for the safety of the patients . . . ." *Id.* Defendant noted that Bernard's employment contract "indicates a positive

drug test will result in termination of employment," and that "treatment [for Fentanyl addiction] began after his insurance coverage was terminated." KCL_0000005.

Defendant stated that Bernard had exhausted his administrative remedies with respect to both the long-term and short-term disability claims. *Id.*

## II. Motion in Limine

Bernard has not opposed Defendant's motion in limine to limit the record on the administrative appeal to the administrative record and group insurance policies. Moreover, the Eighth Circuit has stated that courts are to "examine only the evidence that was before the administrator when the decision was made . . . ." *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008). The Court accordingly grants Defendant's motion in limine.

## III. Motion for Summary Judgment

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 518 (8th Cir. 2010) (citing *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005)); Fed. R. Civ. P. 56(a).

### A. Applicable Standard for Review of Claim Administrator's Denial of Benefits

"The district court generally reviews a plan administrator's denial of ERISA benefits de novo." *Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 986 (8th Cir. 2014) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Only if "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan" does "the district court review[] a plan administrator's denial of ERISA benefits for an abuse of discretion." *Johnson*, 775 F.3d at 986-87 (quotation marks

omitted, quoting *Firestone Tire*, 489 U.S. at 115). The Eighth Circuit "require[s] explicit discretion-granting language in the policy or in other plan documents to trigger the ERISA deferential standard of review." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003) (quotation marks and citation omitted).

Here, both the short-term and long-term policies state that "the claim form(s) must be forwarded to the individual authorized to evaluate claims (Administrator or Insurance Company's Claim Representative)" and that "[t]he individual authorized to evaluate claims will determine if benefits are payable and, if due, issue payment(s) to you." KCL_0000218; KCL_0000545. Both policies also specify that the insurer determines whether the claimant is disabled: "You are considered disabled when *We review Your claim and determine* that, due to Your Sickness or Injury: 1) You are unable to perform all the Material and Substantial Duties of Your Regular Occupation; and 2) You have a 20% or more loss in Your Weekly Earnings." KCL_0000534, KCL_0000205.

The phrases "individual authorized to evaluate claims," "will determine if benefits are payable," and "You are considered disabled when We review Your claim and determine that . . ." expressly grant Defendant authority to determine eligibility for benefits. *Cf. Brown v. Seitz Foods*, 140 F.3d 1198, 1200 (8th Cir. 1998) (finding that "words like 'to be considered disabled,' 'normally,' 'as long as the definition of total disability is satisfied,' and 'due . . . proof of loss' . . . 'do not trigger the deferential ERISA standard of review.'"). Accordingly, the Court reviews Defendant's decision under the "deferential" abuse-of-discretion standard. *See Miller v. Hartford Life & Accident Ins. Co.*, No. 19-1096, 2019 U.S. App. LEXIS 37168, at *6 (8th Cir. Dec. 16, 2019) ("Where an ERISA plan grants the administrator discretion to determine eligibility for

benefits and to interpret the plan's terms, courts must apply a deferential abuse-of-discretion standard of review.").[2]

Under this standard, the Court may "reverse the plan administrator's decision only if it is arbitrary and capricious." *Id.*, at *7. A decision is deemed "arbitrary and capricious" unless it "was supported by substantial evidence, meaning more than a scintilla but less than a preponderance." *Id.* (quotation marks and citation omitted). If the decision "is supported by a reasonable explanation, it should not be disturbed, even [if] a different reasonable interpretation could have been made." *Midgett v. Washington Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009) (quotation marks and citation omitted). "A decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him . . . ." *Miller*, 2019 U.S. App. LEXIS 37168, at *7.

Notably, however, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire*, 489 U.S. at 115 (quotation marks and citation omitted). Where, as here, "a conflict of interest exists because the plan administrator is both the decision-maker and the insurer, [the Court] take[s] that conflict into account and give[s] it some weight in the abuse-of-discretion calculation." *Miller*, 2019 U.S. App. LEXIS 37168, at **6-7; *see also Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830-31 (8th Cir. 2009) (finding that

---

[2] Plaintiff argues that *sole* authority to evaluate eligibility must be conferred on the plan administrator for the abuse-of-discretion standard to apply, but this argument is not in keeping with the language of such cases as *McKeehan* and *Miller*, which require only "discretionary" language, rather than language *exclusively* vesting discretion in the administrator, for the abuse-of-discretion standard to apply.

In any event, as discussed further below, the Court finds that, even applying the more deferential arbitrary-and-capricious standard, the Defendant's decision must be reversed. The Court would reach the same result applying the *de novo* standard of review as well.

11

district court erred in concluding that conflict of interest could not be considered in reviewing denial of benefits).

### B. Whether Defendant's Denial of Plaintiff's Short-Term and Long-Term Disability Benefits Is Supported by Substantial Evidence

Defendant concedes that the short-term and long-term disability benefits denials "were made upon identical policy language . . . ." Doc. 21, p. 26. The Court considers Defendant's proffered reasons for both denials below.

#### i. Whether Plaintiff Was Unable to Perform the Duties of His Occupation Due to Sickness or Injury

Defendant's first stated basis for its denials is as follows:

> Defendant determined that no benefits were payable to Plaintiff under either policy because there was no evidence in the administrative record establishing that due to sickness or injury Plaintiff could not perform the substantial and material duties of his occupation on his last day worked, October 6, 2017. Although Plaintiff admitted to drug use and failed a drug test administered by his employer, the employer stated that Plaintiff had been performing the duties of his occupation in a satisfactory manner and there was no indication from his performance that he suffered limitations or restrictions that rendered him unable to perform his occupation. Indeed, Plaintiff admitted that he had been using Fentanyl, at work, *for two years* prior to his drug use being discovered. There is no evidence in the record that Plaintiff stopped working because he was unable to perform the duties of his regular occupation. Rather, ALL the evidence shows that he stopped working because he violated the terms of his employment contract by using drugs in the work place and failing a drug test. Notably, the drug test was administered solely because coworkers saw Plaintiff using syringes on himself rather than on patients, not because Plaintiff was not doing his job.

Doc. 21, p. 28 (citations omitted).

Thus, Defendant's denial of benefits under both the short-term and long-term plans was predicated on the conclusion that the only bar to Bernard's continued employment was his failed drug test and use of drugs at the workplace—and not any impairment due to narcotics addiction.

Both the short-term and long-term disability policies define disability as "when We review Your claim and determine that, due to Your Sickness or Injury: 1) You are unable to perform all

the Material and Substantial Duties of Your Regular Occupation; and 2) You have a 20% or more loss in Your Weekly Earnings." KCL_0000534, KCL_0000205.[3] The policies define sickness as "illness, disease or physical condition," and further state that "[d]isability resulting from the Sickness must begin while You are covered under the policy." KCL_0000529, KCL_0000201. The long-term disability policy expressly covers drug abuse. *See* KCL_0000210 ("The lifetime cumulative Maximum Period of Payment for all disabilities due to Mental Illness, alcoholism or drug abuse is 24 months . . . ."). The short-term disability policy does not exclude drug abuse from coverage. Importantly, Defendant makes no argument that drug addiction does not qualify as a disability under either the short-term or long-term disability policies.

Defendant also does not argue that Bernard did not have, or did not present evidence of, an addiction. Indeed, Defendant itself states that, "[s]eventeen (17) years before his last day of active employment, Plaintiff had a history of drug use." Doc. 28, p. 7. The administrative record shows that Bernard underwent treatment for Fentanyl addiction in 2001 and 2002 and that he saw a counselor for his addiction for several years after that treatment. *See, e.g.,* KCL_0000060; KCL_0000117; KCL_0000265.

Rather, Defendant's conclusion that Bernard's condition did not prevent him from completing his duties on October 6, 2017 is premised on the facts that (1) Bernard's use of drugs at work, not a disability, triggered the series of events culminating in his termination; and (2) Bernard performed his job in a manner satisfactory to his employer until his drug use came to light.

Defendant's conclusion unreasonably divorces Bernard's Fentanyl use on a single occasion from his Fentanyl addiction and relapse. The uncontradicted evidence is that Bernard has a

---

[3] The policies also state that "[t]he loss of a professional or an occupational license or certification does not, in itself, constitute disability. . . ." KCL_0000534; KCL_0000205. However, the parties have not asserted that Bernard has lost his license or certification.

13

documented medical history of narcotic addiction, that, many years before his termination, he received in-patient treatment for approximately three months, and that after discharge, he saw a counselor regularly for seven years. Defendant does not contest that Bernard was clean and sober after that initial treatment until approximately two years before his termination. Defendant does not contest that he thereafter relapsed and that during that relapse he was using Fentanyl while working as a nurse anesthetist.

No reasonable person could find that a nurse anesthetist so addicted to Fentanyl that he injects himself with drugs during the work day while his medical co-workers are nearby is capable of performing the duties of his job. No rational employer would deem an employee under the influence of Fentanyl capable of "administer[ing] local, inhalation, intravenous, and other anesthetics during surgical or other medical procedures," "[a]dminister[ing] general anesthetics to render patients insensible to pain during surgical and other medical procedures, or "tak[ing] necessary remedial action to aspirate secretions from throat[,] larynx and trachea as required." KCL_0000499 (description by Bernard's former employer of certified nurse anesthetist's role). The role of a nurse anesthetist is demanding, requiring focus, clear and quick judgment, and speedy reactions to emergent situations. The fact that his employer did not notice his impairment for some period of time does not mean that Bernard was not impaired. It is evidence only that the employer was not aware that he was impaired. Defendant's argument suggests that had Bernard not failed a drug test but instead told his employer that he was an active addict, the employer would have permitted him to work as a nurse anesthetist because he had performed his job in a satisfactory manner until that date. No reasonable person would think an employer would do that. The fact

that he was fired because of a single drug test[4] does not mean that he was not disabled. And nothing in the policies says that if your disability causes you to be fired, you are not qualified to receive benefits under the insurance policy. Nor do the policies say that if you are disabled before you are fired, you will not qualify for benefits.

While some courts have disagreed as to whether *the risk of relapse* is sufficient to render one disabled, there appears to be a consensus, even in the courts taking the more conservative approach with respect to the risk of relapse, that relapse itself would preclude work in the field of anesthesia. *See Colby v. Union Sec. Ins. Co.*, 705 F.3d 58, 66 (1st Cir. 2013) ("We think it is a commonsense proposition that a substance-dependent individual's risk of relapse can swell to a critical mass of disability. . . . Declaring the plaintiff fit for her usual occupation immediately upon her release from [the treatment center] would, if the plaintiff acted in accordance with that declaration, not only put her at risk but also threaten to endanger her patients. . . . [D]enying benefits to an anesthesiologist unless and until an actual relapse of narcotics addiction occurs is untenable given the serious risk this poses to public health and safety.'" (quotation marks and citation omitted)); *Stanford v. Cont'l Cas. Co.*, 514 F.3d 354, 359 (4th Cir. 2008) (noting, in affirming denial of benefits, that denying disability benefits for recovering Fentanyl-addicted nurse anesthetist would have the effect of "requir[ing] him to return to work and in fact suffer a relapse in order to qualify for long term disability benefits"); *Kufner v. Jefferson Pilot Fin. Ins. Co.*, 595 F. Supp. 2d 785, 796-97 (W.D. Mich. 2009) (criticizing denial of benefits that "would have plaintiff work to the point of relapsing into narcotics addiction, and only then, would plaintiff be

---

[4] Defendant repeatedly describes the drug test that Bernard's employer commissioned as "random" when in fact it was not random, but, instead, triggered by the report of Bernard's co-workers that he was using syringes at work. KCL_0000067. It was because his drug use interfered with his work that he was subject to the drug test and his employment ended.

15

considered for LTD benefits" and finding "untenable" defendant's denial of long-term disability benefits that was based on the "determination that plaintiff can and should work 70-80 hours a week as a hospital anesthesiologist unless and until he has an actual relapse of his narcotics addiction"); *Berry v. Paul Revere Life Ins. Co.*, 2008-0945 (La. App. 1 Cir. July 9, 2009), 21 So. 3d 385, 395-96 (holding, in case involving anesthesiologist who became addicted to prescription drugs, that "probability of a relapse" is "crucial to a determination of 'disability'").

Defendant's position—which, in effect, is that relapsing to the point of abusing drugs at work, in front of co-workers, in the midst of the workday, may be deemed a disability only if the claimant appeared visibly impaired in the operating room or in fact injures or kills a patient because he was under the influence of narcotics—is one that no reasonable arbiter could reach. *See Kufner*, 595 F. Supp. 2d at 796-97 (noting, in reversing decision denying long-term disability benefits to anesthesiologist with opioid and alcohol dependence, that "Defendant would force plaintiff to work to the brink of failure to justify disability benefits, thereby imposing an unacceptable risk on patients, hospitals and the public generally—a risk of error that neither plaintiff nor the public should bear").[5] Defendant's position is so unreasonable that it raises a question as to whether its conflict of interest determined the administrative-level outcome.

---

[5] Defendant mistakenly claims that *Hampton v. Reliance Std. Life Ins. Co.*, 769 F.3d 597 (8th Cir. 2014) "held that a failed drug test did not establish disability." Doc. 21, p. 32; Doc. 26, p. 38. In fact, *Hampton* involved a claim by a truck driver who was no longer able to drive commercial motor vehicles because he lost his license due to diabetes mellitus. The Eighth Circuit held in that case that the loss of a license for a medical reason does not by itself establish disability. The Eighth Circuit mentioned "a failed drug test" only as an example in explaining why the plaintiff's suggested interpretation of the policy language was illogical. *Id.*, at 601 ("[Plaintiff's] interpretation would render the loss-of-license provision surplusage. The definition of 'Total Disability' includes only inability to work due to injury or sickness, so a driver who is unable to drive for non-medical reasons (e.g., a failed drug test or a bad driving record) would not qualify for benefits in the first place." *Hampton* did not consider or decide whether one who is addicted to narcotics might be deemed unable to perform the duties of his job as a nurse anesthetist. *Hampton*'s passing reference to a failed drug test that precludes the issuance of a driver's license

### ii. Whether the Lack of Treatment History Supports Denial

The second explanation that Defendant proffers for its denial of Plaintiff's short-term and long-term disability benefits is that the medical records in the administrative record "show no treatment history or evidence of impairment ***before*** the date that Plaintiff lost his job and his coverage terminated . . . ." Doc. 21, p. 28. If Bernard was not disabled until his employment terminated, he would not be eligible for disability benefits under either policy. *See* KCL_0000526 and KCL_0000197 (defining "eligible class" as consisting of "Full-Time Employees in Active Employment"); KCL_0000532 and KCL_0000203 (specifying that coverage ends "on the earliest of . . . 2) The date You are no longer in an eligible class; . . . [or] 5) The last day You are in Active Employment except as provided under a covered Leave of Absence").

Defendant's denial is premised on the fact that Bernard did not receive treatment for his *relapse* before his employment terminated on October 6, 2017. However, Defendants have not suggested that an insured must receive medical treatment for disability prior to the end of coverage to be eligible for benefits. Each policy defines disability as follows: "You are considered disabled when We review Your claim and determine that, due to Your Sickness or Injury: 1) You are unable to perform all the Material and Substantial Duties of Your Regular Occupation; and 2) You have a 20% or more loss in Your Weekly Earnings." KCL_0000534. Each disability policy defines sickness as "illness, disease or physical condition," and further states that "[d]isability resulting from the Sickness must begin while You are covered under the policy." KCL_0000529. The policies do not suggest that *treatment* must begin while the insured is covered under the

---

does not suggest that the Eighth Circuit would view the divorcing of an employee's failed drug test from his documented history of drug addiction and recovery as reasonable. Had Bernard's license or certification been revoked, then *Hampton* might have been instructive. As that is not the case, *Hampton*'s reference to a failed drug test is not relevant.

policy.[6] Thus, the fact that Bernard did not see a doctor until 11 days after his last day of employment does not establish that he was not disabled prior to the end of his employment.

Likewise, the fact that Bernard's treating physician noted "≈" October 1, 2017 as the day on which Plaintiff ceased working due to impairment, when in fact Bernard ceased working on October 6, 2017, is not a reasonable basis for finding that no disability existed before Bernard's employment terminated. The fact that the treating physician estimated that Bernard became disabled on October 1 based on when he thought Bernard had been terminated does not undermine the rest of the evidence in the administrative record. No reasonable person would ignore the evidence that Bernard had a Fentanyl addiction long before October 1 or October 6, that he had relapsed well before October 6, 2017, and that he continued to use Fentanyl up until his employer terminated him on October 6, 2017. Indeed, not only did he use Fentanyl, but he used syringes in the work place in front of his co-workers and had nearly 110 times the amount of Fentanyl in his system than the minimum required for a positive test for Fentanyl.

Again, Defendant's conclusion raises a question as to whether the conflict of interest determined the administrative outcome.[7]

---

[6] Even if evidence of treatment prior to the end of coverage were required, the administrative record contains uncontested evidence of Bernard's history of narcotic addiction and prior in-patient treatment.

[7] Defendant's overlooking the substantial evidence in the record showing that Bernard had suffered from a narcotics-addiction relapse prior to the end of his employment, and the end of his coverage under the short-term and long-term disability policies, suggests that Defendant did not approach Bernard's claim in a disinterested manner, in the interests of the plan participants. *See Kufner*, 595 F. Supp. 2d at 796-97 ("That defendant was willing to go to excessive lengths to deny benefits on such questionable reasoning persuades the Court that defendant was motivated by its fundamental financial interest in denying benefits. These circumstances warrant additional weight to the conflict of interest factor in favor of plaintiff, particularly absent any evidence that neutralizes the conflict of interest.").

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion in limine is GRANTED, Defendant's motion for summary judgment is DENIED, and Bernard's motion for summary judgment is GRANTED.  The Court finds that Defendant's denial of both short-term and long-term disability benefits was not supported by substantial evidence in the record.  The administrative record establishes that a disability within the meaning of the policies prevented Bernard from fulfilling all of the duties of a nurse anesthetist prior to the termination of his employment on October 6, 2017.  The Court remands this matter to the administrator for evaluation of the duration and scope of Bernard's disabilities.  The Court reminds the administrator that "**ERISA** imposes higher-than-marketplace quality standards on insurers," requiring "that the administrator discharge its duties in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan, § 1104(a)(1)." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (quotation marks and citation omitted).

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:  February 28, 2020
Jefferson City, Missouri